which is United States of America v. EZ Lynk, et al. Congress's goal in enacting Section 230 of the Communication Decency Act was to ensure that Internet services that simply host other people's speech could not be held strictly liable for the content of that speech as it would be a common law. The statute's language reflects that goal. It prohibits any provider of a computer service from being treated as a publisher using the common law definition of publisher as one who communicates information to others. And Congress's goals are reflected also in the findings and policy subsections of Section 230 where it noted the importance of making educational, political, cultural, intellectual speech freely available to individuals. And so to ensure that flow of information, Section 230 grants immunity to providers of computer services that simply maintain a neutral conduit for information provided by others. Yeah. Do you agree that the Google and Apple app stores are covered by Section 230, generally speaking? Well, so we have, we do not believe that software in its functional operation is information within the meaning of Section 230. So then an awful lot of what's in those app stores is not covered, right? Because if I sign up for Uber or whatever, I'm not interested in learning facts off the screen. I'm interested in the functionality of being able to order a ride. Right. And so what I'm getting is software that connects to whoever Uber is and sets up the ride. It's a functional thing. Right. So there may be some small component of that that is informational, but by and large we do think that that functional component and that Discord and Corley and Vartuli distinguish those two components of what software does, of communicating information to people and serving as essentially a tool, as something that just does something. And this case is really purely in the tool category. All these delete tunes do is they are installed in a vehicle engine computer and they remove the emission controls. And that is really no different from the more classic types of defeat devices, like installing an exhaust pipe that has no catalytic converter, or the Senate committee that passed the 1990 amendments of the Clean Air Act recognized that a computer shouldn't. You wouldn't say that selling a screwdriver, which could be used to unscrew a catalytic converter or something like that, is unlawful, right? We would not, but the Clean Air Act has other elements to it. It says that a principal effect of what is being sold has to be to defeat the emission control. But your own complaint, which I take it was carefully drafted, says many of the software programs that are available through this system are emissions control defeating programs. It doesn't say most. It doesn't say virtually all. It doesn't say every. It says many. Now of course, what we've got is the complaint. We don't have a factual record yet, which might be one of your arguments, I suppose, at some point. But how do we know that that is a principal effect? Do we know anything? I've got to ask both of you. What else is out there on this platform? It's outside the record, but I assume that both sides know. What other kind of stuff is there that is not emission control deleting? So I confess I do not know, and we think we are entitled to discovery as to what else might be out there. It is our understanding of how this system works that the preponderant purpose and effect is to defeat emission controls. That's what it's marketed as. That's what it's sold for. That's what its agents promote it as doing. But to the extent there are other things, two things. One, yes, discovery we think we're entitled to based on the allegations here. But two, I wouldn't want to open the door to basically manipulating the percentages of what's available on this EZ-Link cloud. If they just were to sort of upload a whole bunch of legitimate things and then say, well, only 1% is the delete tunes, we do not think that would defeat our claim. And we wouldn't want that to be, so we don't think it should be just a matter of percentages. But discovery should reveal the entire universe of what's actually going on here. Can I ask a back then to the definition of information? Information is a very broad word. And software programs are generally described in dictionaries and so on as providing information to the user's computer. Not just, even things, even what is the content on YouTube, I can see it as a video of something that appeared on Saturday Night Live last week. But what it's sending over the internet is zeros and ones. And it's telling my computer stuff, which lets the computer put on that screen. That's the information that is being transmitted. It is certainly true that the word information can capture software, both in its communicative and its functional sense. But what our argument here is that in the sense it was used by Congress in Section 230, it's narrower. And that, again, goes back to not only the history of trying to defeat the Stratton Oakmont decision of the Supreme Court in New York that was a defamation case and that was really about this classic forum in which an internet content provider allows people to post what they want and to speak what they want and not be held liable for what these third parties say. And it's also reflected, as I mentioned a moment ago, in subsections A and B of Section 230 that repeatedly reflect that that is what Congress was going for. It's talking about educational and political, cultural content. It's talking about people talking to people. That is the information that Congress was immunizing in Section 230. So, yes, it can be read that way. But the Corley and Bartuli, it could also be characterized as speech in a way. But they recognize under the constitutional rubric that this is different. I just prefer to, I wanted, if you could shift a little to the argument related to another information provider. I gather your contentions there are that you have allegations in the complaint, on the face of the complaint, that would establish EZ-Link's involvement, active involvement rather than passive, neutral involvement, in the creation and development of the delete device software. Could you point to which allegations specifically you think would make that out such that it would defeat, on the face of the complaint, the affirmative defense? Sure. So most fundamentally our allegation is that you've got this software and you've got this device that installs it. The roommates.com decision from the Ninth Circuit uses the phrase, let me make sure I've got the, excuse me for a second. The roommates.com says that making it usable is enough to be not a third party information provider. So at core, that basic allegation should satisfy that element. But we also look to other case law that uses words like that. I'm sorry to just jump in and this sort of relates to what Judge Nathan was asking you. Is your view, if there are not allegations that EZ-Link was involved, well, if EZ-Link is not involved in the creation of these delete tunes, do you feel like you still have a claim? And to the extent that the argument is it materially contributed, as you were asked before, sort of what aspects of your complaint do you feel support that? Right. So the aspects of the complaint are that, first of all, the developers of the software are given preview access to this system. And the fair inference from that is that they are using that in order to help develop and that EZ-Link is encouraging them to develop unlawful software. And in fact, we have in the complaint a quotation from one of the developers of this illegal software saying, we worked with EZ-Link during the development of this software. So right there we have a statement by the developer of illegal software that they were collaborating and working with the hardware maker, the defendant in this case. We also allege that they provide what they call a profile editor tool, which enables developers of software to develop their software specifically for this system. And I want to note too, just as a legal matter. On the points you're raising, does it matter that there aren't allegations that this is different than what EZ-Link did with any other non-circumventing software? I'm not sure I follow the question. The allegations that you're pointing to of what EZ-Link was doing were true of what EZ-Link does with any kind of software that doesn't include the regulation circumvention. Wouldn't that matter for purposes of 230? I don't think it matters, because I think that as long as they're encouraging any substantial amount of unlawful software, that should be enough to say that they are under subsection F of section 230, that they are responsible in part for the development of the unlawful information. And again, we go back to, we've got the statement from this one. The quotation I offered a moment ago is from a company called GDP, which has been criminally convicted of offering delete tunes, unlawful software. But your question also goes back to Judge Lynch's question about the percentages. We don't think that it's just about that. As long as they are encouraging the development and use, I'll get to use in a second, but as long as they're encouraging the development of this unlawful software, that's a violation of the Clean Air Act. And I will note that any unauthorized software that alters these computer calibrations that affect the emissions is a violation of the Clean Air Act, and our allegations establish that. I also want to note that another verb that the court... Can I back up and ask something about whether you're claiming at the moment more than you need to claim? Isn't the question properly at the motion-to-dismiss stage not something like, do your allegations of collusion conclusively establish, putting aside your other argument, conclusively establish that EZ-Link has lost its immunity, shall we say, but only whether you have alleged enough that it is plausible to believe that? In other words, shouldn't we be applying the Twombly standard, in effect, to whatever your allegations are about whatever your theories are? And I guess one question has to be, well, what is the legal theory, and does that work? But then if we find one that works, I don't know that it's your obligation at the pleading stage to establish that here are facts that conclusively show that if they're true, if we can back that up with evidence, that they've lost their immunity, but only whether we've alleged enough that it is plausible to think that. And that brings us to discovery. I 100 percent agree with that. That is the standard. I would add to that, too, that we've said in the brief several times that this is an affirmative defense. It's their obligation to plead and prove it. It is not our obligation to anticipate it. Yeah, that's true. But at the same time, if the — that only gets you so far, right? Because it is well-established that Section 230 immunity can be decided at the motion-to-dismiss stage if the facts that establish the defense are apparent on the face of the complaint. But we've got this kind of negative feedback that — do you have to have alleged enough to undermine their argument that your complaint already shows Section 230 immunity? I don't think that it's well-established as a broad principle. I think that it's being applied in certain specific cases. If you look at, say, the Force case, you have there a classic forum and then you have an allegation that it's being promoted by, I think it was Facebook. That's all on the face of the complaint. So in the particular case, yes, an affirmative defense can be adjudicated. But this — and this particular prong of whether there was collaboration with others is something that really is factual and that was not something that was our obligation to plead as part of a Clean Air Act claim. So it's — I think the affirmative defense aspect and the impropriety of deciding that on a motion-to-dismiss is particularly salient for this prong of our argument. I would also, just to get to — if I may — I'll give you another minute and then we'll —  I just want to note this sort of, I think, perhaps main argument is that our complaint does not treat them as a publisher because this is all about their own unlawful conduct. This is about conduct that installs illegal software on vehicles. And I think a core component of what their argument is, is to say, look, if we bifurcate this, if we say to someone, you make the software and we make the installer, and then the software maker says, well, our software doesn't do anything until it's installed, and the installer says the software — our installer doesn't do anything without software, then both parties — No, you just argued about collusion, which is a different situation, perhaps. If they have a system that does many different kinds of things or authorizes the doing of many different things, then their system does not, in fact, do anything to defeat the programs. It's only when combined with the software. The software developer does not have that claim because the software developer is designing and selling something that once installed, and there could be lots of ways of installing it, is definitely defeating it. And if the two parties are colluding, that's another separate situation. But I think you are treating them as responsible for the contents of the software that their system enables. Isn't that clearly what you are doing here? We are treating them, yes, because that is the intent and effect of this system, is to install that illegal software. And it's not, as alleged, an innocent device that just happens to be used for this purpose. Even if there were no cloud, even if you just found your delete tune somewhere by your favorite search engine, if this, as we have alleged it to be, is a device that installs that illegal software, is designed to do so, and is promoted for the use of doing so, that's a violation. And that not only establishes the violation substantively, but it defeats their argument that this is not about being a publisher because it's only about the delete tunes, which is separate. It's all of a package. All right. Thank you. Thank you very much. We'll have some rebuttal. Mr. Shurker, whenever you're ready. Thank you.  May it please the Court, Elliot Shurker on behalf of the employees. The EZ-Link product is nothing more than a router. It plugs into a vehicle and allows access to the vehicle's computer by the car driver or owner, just as a mechanic gains access to the computer when a car is brought in for servicing. And, Judge Lynch, you're exactly right. The theory you heard argued by the government today would make Google or Apple or any other provider of an app store liable for anything illegal about the apps that are sold on the store and develop entirely by third parties. The collusion theory that you heard argued at the end of the government's argument appears nowhere in the complaint. And we have to presume that this complaint is the government's best shot at stating a claim against the defendants. Well, when you say the collusion theory appears nowhere in the complaint, then what is the function of the various allegations that do appear in the complaint for what they're worth? I mean, it's a separate argument that they don't show that much, but there are allegations that go to the people who are responsible for the delete tunes were consulted in the course of creating the EZ-Link system or that the, I think, less impressive allegations that various health functions, that people who are selling delete tunes are thanking the EZ-Link support staff for what it's doing. Now, you're perfectly free to argue anything and certainly to argue that those allegations don't say very much. But what are they doing there if that's not for the purpose of establishing that EZ-Link is not a neutral? They're apparently there for the purpose of trying to show that EZ-Link was directly and materially, that's the standard this Court has adopted, involved in the illegal activity and therefore is outside the scope of Section 230. So why isn't, you understand the collusion theory to be something different than that? Very much so. Because the allegations which are in the complaint at paragraphs 66 through, 66 through 70 that appears at pages 20 through 21 of the complaint are about drivers, are about owners reaching out to. I was looking at on J29 paragraph sub A, paragraph 57, but the sub and below the section of the title is defendants enable the creation of effective delete tunes and profit from the sale. So those allegations I understood to go to collusion. Well, Your Honor, the allegations are that the heading is defendants enable the creation of effective delete tunes and profit from the sale of delete tunes. That's the heading. That's not what the allegations state. Because delete tunes, as the government admitted this morning and as is absolutely clear from the face of the complaint, are all developed by third-party developers. EZ-Link does not participate in any way in the development of delete tunes. We have to understand that. Paragraph 57. Yes, I'm reading paragraph 57, Your Honor. Yeah. The defendants regularly collaborate with technicians to ensure that delete tunes capable of effectively disabling emission controls are readily available to drivers. It talks about noted on the Facebook page that it collaborated with EZ-Link during the development of the EZ-Link system, et cetera. Yes, Your Honor, that's exactly what it states. And that does not show, that does not allege that EZ-Link was involved in the creation of these delete tunes. EZ-Link is a platform. EZ-Link is a – the cloud, the EZ-Link cloud is a platform through which car owners and developers, which we call technicians, can join together to pass software from the developer to the car owner, and the car owner can then place it in the computer, so to speak. Is your view, then, that if only if EZ-Link is involved in the creation, is it sufficient, even though the allegation seems to be that the delete tunes are part of this entire system that allows them to be effectively downloaded? That's absolutely not so, Your Honor, on the face of the complaint. Well, just – I mean, before I get to that, though, is your position, though, that unless EZ-Link is involved in the actual creation of the delete tunes, that they're immune? Well, that is the allegation, that defendants enable the creation of the effective delete tunes. That is the allegation that Your Honors were referring to. That is the government's position. There's also a reference to, as we just heard, the fact that the allegations also are arguing that there's collaborations with the technicians to enable the effective – enable delete tunes to effectively disable admissions. And so I guess I'm just trying to pin you down on whether or not your position is if they are not involved, if EZ-Link is not involved in the creation, then there's immunity. Well, I think that if EZ-Link is not involved in the creation, then clearly we have immunity. But there's no legal requirement anywhere in the case law that the only way one can directly and materially assist someone's illegal activity is through helping to create the app. But I don't see any other way when we're dealing with an application – I hate saying app – an application, a computer application, that a neutral platform, in this instance, exactly the same as an app store on Apple or Google, could be directly and materially involved. What EZ-Link was doing in dealing with the drivers and dealing with the creators was saying, here is our system, here is our neutral platform. And when EZ-Link's employees helped the drivers, and that was what I was referring to beginning in paragraph 66, they were helping them install the EZ-Link system. And also remember that it has to be a principal effect, a principal effect for liability under the Clean Air Act of the device that it evades emission controls. And as I started to say at the beginning, we have to remember what the EZ-Link system is intended to do. If I take my car out of town and it develops some sort of problem, I can call my mechanic, I can hook my mechanic into the EZ-Link software. The mechanic can look at the computer and say, oh, you've got this problem XYZ, Chevrolet just developed a patch for it, I'm going to send it to you. And he sends it to me, I send it to my computer, and I go on with my trip. That is the basic function of the EZ-Link system is to allow communication between the driver and the computer. It also allows for the installation of programmable items on the computer, which, as we point out in our brief, is exactly what the Clean Air Act requires, that third parties be allowed to create programmable items that can be transferred to the computer. So the basic function of EZ-Link is not to install delete tools. If you read the government's brief, you could reasonably draw that conclusion, but that's simply not so on the face of the complaint. It is a neutral platform designed to communicate with the car's computer. It is a router that allows one with a telephone to communicate with one's own vehicle. Just as I said at the beginning, a mechanic does when you bring it into the store. Could you give me an example? It can be a hypothetical example. You gave one about enabling communication that, in effect, you're saying could be done remotely. Correct. Rather than having to bring it into the dealer or the mechanic and have that person use their tools to access the computer. Are there other vehicle-modifying uses that do not affect emissions controls that this could be used for? Software that improves performance, software that improves gas mileage. If you look online for automobile, third-party automobile programs, there are innumerable programs for better performance and cleaner engines and such that one can install through the computer on one's car. I mean, another function would be if you take your car to a different mechanic, the mechanic says it needs $10,000 worth of repairs because XYZ shows up on the computer. I can go on my phone. I can look at the same thing the mechanic is looking and say, wait a minute, it doesn't say that. It says I need a new battery. So it has a wide variety of very useful functions that don't exist outside of the opportunity to communicate directly with the computer. But does it matter, though, that there are other uses, effects of it? Is it enough that if one of the principal effects is to be used in these types of device-defeating systems, and if the statute is ordered to say this is a principal effect and it's known that this is a principal effect of it, does it matter if there are other uses and intents and purposes that aren't related to that? I mean, is that enough to say, well, this is not the intent of the device and it has other uses, but if one of the principal effects of this is with respect to these delete tunes and it is known that that is the case, why isn't that enough to take it out of the community? Your Honor, that's a fair question. But if you look at the way the district court dealt with that, the court said please look at the exact words of the complaint. It says many so-and-so programs out there are delete tunes. It doesn't say most. It doesn't say all. And the government can't give you percentages. The government says percentages don't matter. But we're talking about principal, the principal effect of the device. And when it's clearly designed, it leaps off the page when you look at the actual facts. So that's the election complaint. And as I started to say, and I don't want to lose this point, we have to presume when we're answering these kinds of questions that what the court is looking at is the government's best shot, because they didn't move to amend. They didn't seek to allege any more than they've alleged. So this apparently is all they have. Some isolated instances of employees helping to install EasyLink software, not delete tunes. One instance of allegedly EasyLink showing its program to a creator of delete tunes. One. And then the other obvious uses for this device. Is there more there? What types of things additionally could they have shown at this stage pre-discovery? I'm sorry, Your Honor? Like what types of you're saying they haven't alleged principal effect. I'm just wondering whether or not what types, what is missing from the complaint that they would be able to show at this stage of the pleadings? What types of things? It's not a question of what's missing. It's a question of what's on the face of the complaint. They don't allege that this is the, they don't allege. Well, I guess my question more is the things that are missing, are those things available to them now? Like information about what percentage of EasyLink purchasers are using it and not. So that would be hard to track. But, I mean, those types of questions. Is that information available to them? Well, Your Honor, two things. First of all, I was responding to Judge Lynch's question about what else the device can be used for. And, yes, that is outside the record. That is theoretical, I guess, at this point, although it's verifiable. It's not a question of what's missing. It's a question of what they say. And what they say in the complaint, when it's read carefully as the district court read it, is that this device is a system on which car drivers can reach out to developers of illegal software. And I would note that the record does show that EasyLink's terms of use say, do not use this system for anything illegal. That's clear in the terms of use. But leaving that aside, an individual car owner can reach out, find someone who's selling the lead tunes and use the process I described earlier about the mechanic to send it to the driver. That can be done. And that's what's alleged in the complaint. But the complaint doesn't allege facts to show that this is a principal use of this system. It has scattered individual events, none of which involve any of the named defendants, none of which involve defendants who are alleged to have authority to speak or act for EasyLink, officers and such, that have had dealings with drivers and one or two dealings with the developers of the lead tune software. And that's not enough, we submit, to get around what Section 230 is about. Because Section 230 is intended, and as the district court said, even if this wasn't in Congress's mind at the time they adopted 230, even if this scenario wasn't there, the words say what the words say. And we're bound by those words. And the words say that a publisher, which is what we are at best in dealing with the cloud, and only dealing with the cloud, forgetting everything else I've said about dealing with a vehicle, only dealing with one component of the EasyLink system, at best they're a publisher. And publishers are not liable for third-party content, period. Full stop is the intent of Section 230, unless they participate directly and materially in the development of the illegal content. If a streaming service shows a movie that somehow has some illegality involved in it, and the streaming service is making it available, just like EasyLink is making it available to the public, or making these apps available to the public, if the driver chooses to reach out and find a developer with something that the driver wants. And there's something wrong with that movie. Unless the streamer was directly and materially involved in the creation of that movie, there's nothing else that there is except showing it. And there's nothing else here except allowing a driver to use a neutral platform to reach out to someone who has created something allegedly illegal. It's really no different. I believe my time has expired, and then some. Yes. All right, thank you. Thank you very much. Thank you, Your Honor. Just a few points on rebuttal. First of all, the bulk of the argument from my adversary is simply to ignore the complaint and ignore the allegations. To say that it's a neutral device, that it's intended for legitimate use, that its basic function is to be used by legitimate car dealers, is simply to say that the complaint is wrong. We have alleged that that is not what it's intended and actually used for. That's enough to meet the plausibility standard. To the extent they're saying that there's just not enough in the complaint, I would note, first of all, the plausibility standard should entitle us to discovery. It's also important to note that this is a clandestine industry. This is illegal. And so, of course, they're not putting out there what percentage of illegal use is going on. It's hard for us to discover that without discovery, and we should be entitled to that. In terms of the allegations about the relationship with the developers, first of all, I would note that under the case law, it's not just about collaboration. The verbs that the case law uses are participated, assisted, encouraged, advised, contributed, in addition to collaboration. So it's a much looser relationship than just some sort of formal collaboration. Well, if, for example, in developing the system, the hardware, and the links that would enable the use of software, the EasyLink developers reached out to people known to be creating delete tunes and said, we'd like you to look at our system and see whether it works for you. And they come in and say, yeah, that would be great. But they come in and say, well, we'd have to put certain tweaks. And then there was some discussion of, well, you'd be able to link it up if you did this and that. You're saying that would be enough. They wouldn't have to actually send their designers out to work with the delete tunes creator on the delete part of their program. Yes, that would absolutely be enough. I think that the case law repeatedly refers to, again, the statute says, in whole or in part is responsible for the development. If they're encouraging it, if they're going to the makers of this software and encouraging them to make software for this device, and we have alleged that they have, then that is enough to defeat the immunity under Section 230. To go back to the App Store example for a moment and the question of whether information is limited to things that people can talk to people with rather than machines can talk to machines, it looks to me as if the Third Circuit and the Ninth Circuit have disagreed with you about that. The Ninth Circuit has said the Apple App Store is under Section 230 in connection with a malware program, which seems to be at least as potentially harmful as the delete tunes. Are there any circuits that have adopted your standard that says that's wrong? We do not know of any. I would say the Ninth Circuit decision is unpublished and non-presidential. The Third Circuit is— I know we all say that. Let me just— We just say it in unpublished opinions. I understand, but I think in both circuits there's very little analysis of this question, and so I think— But this would be a split from the Third. You can't distinguish, can you? I think it might be, but only in— The Third Circuit said that any signal can be considered information. That seems to me a very broad reading of what's immunized. If somebody just were to flood the Internet with a malicious signal, and the forum that allowed it that as a conduit did nothing to stop it, that doesn't seem to me what Congress is trying to immunize under Section 230. So there's some—I would say there's some tension. I'm not sure there's a square conflict with the Third Circuit, but I do acknowledge that the Green decision points the other way. And then I also want to note just that our argument against Section 230 immunity is not just about the relationship with the delete tune makers. It's about their own conduct. And the case law repeatedly says that you have to look at what legal duty is at issue, whether that legal duty arises from being a publisher or whether it arises somewhere else. The legal duty here arises out of something, the Clean Air Act, that has nothing to do with disseminating third-party speech. It has to do with their own illegal conduct. And that fundamentally shows that Section 230 immunity should not apply. If there are no further questions, we ask the Court to reverse. Thank you very much. Thank you. Thank you to both of you. We'll take the case under advisement.